**Graham v Metropolitan Jewish Home Care, Inc.**

2025 NY Slip Op 31824(U)

May 20, 2025

Supreme Court, Kings County

Docket Number: Index No. 524977/2020

Judge: Consuelo Mallafre Melendez

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

At an IAS Term, Part 15 of the
Supreme Court of the State of NY, held
in and for the County of Kings, at the
Courthouse, at 360 Adams Street,
Brooklyn, New York, on the 20th day of
May 2025.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

------------------------------------------------------------------------X

RAYMOND GRAHAM as Administrator of the Estate of
MARY GRAHAM and RAYMOND GRAHAM, Individually,

      Plaintiff,

   -against-

METROPOLITAN JEWISH HOME CARE, INC. d/b/a MJHS
HOME CARE, STATEN ISLAND UNIVERSITY HOSPITAL
and GOLDEN GATE REHABILITATION AND HEALTH
CARE CENTER, LLC d/b/a GOLDEN GATE
REHABILITATION AND HEALH CARE CENTER,

      Defendants.

------------------------------------------------------------------------X

**DECISION & ORDER**

Index No. 524977/2020
Mo. Seq. 2 & 3

**HON. CONSUELO MALLAFRE MELENDEZ, J.S.C**.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:

<u>NYSCEF #s:</u> <u>Seq. 2:</u> 50 – 52, 53 – 110, 129 – 130, 131 – 138, 150

        <u>Seq. 3:</u> 113 – 116, 117 – 126, 139 – 140, 141 – 146, 151 – 152

Defendant Staten Island University Hospital ("SIUH") moves (Seq. No. 2) for an Order, pursuant to CPLR 3212, granting summary judgment in the movant's favor and dismissing this action against them in its entirety.

Defendant Metropolitan Jewish Home Care, Inc. d/b/a MJHS Home Care ("MJHS Home Care") separately moves (Seq. No. 3) for an Order, pursuant to CPLR 3212, granting summary judgment to the movant and dismissing all causes of action against them.

Plaintiff opposes both motions.

1

[* 1]

Plaintiff commenced this action on December 14, 2020, as administrator of Decedent's estate, asserting claims of medical malpractice, negligence, and wrongful death against the moving defendants, in connection to the prevention and treatment of pressure ulcers.

The treatment at issue concerns numerous admissions to SIUH between October 2017 and December 2018. Decedent was in her early 70s and had a history including congestive heart failure, end stage kidney disease, diabetes, and COPD. She had undergone an above the knee right leg amputation in February 2017 from diabetic complications.

When not being treated at SIUH, Decedent was treated at multiple subacute rehabilitation facilities including non-party Clove Lakes Healthcare, non-party Sea View Hospital and Home, and co-defendant Golden Gate Rehab.

Decedent underwent a left leg amputation at SIUH on July 25, 2018. A suspected deep tissue injury on her sacrum was first documented during the July 2018 admission. Decedent's last admission to SIUH was October 25, 2018 through her death on December 20, 2018, during which time her sacral pressure ulcer advanced from stage III to stage IV, she was diagnosed with osteomyelitis, and she ultimately passed away.

With respect to defendant MJHS Home Care, they provided at-home nurse and physical therapy visits to Decedent from February 16, 2018 through April 2, 2018. She had no pressure ulcers during this period, and her only wound was a surgical incision on her nose which healed.

Following her left leg amputation, MJHS Home Care conducted an initial assessment for at-home care on August 1, but no formal start of care was initiated. MJHS Home Care conducted another initial assessment and prepared a plan of care in September 2018, but she was transferred to a hospital the day after the first visit and did not receive any further MJHS Home Care services.

2

[* 2]

Plaintiff alleges that SIUH and MJHS Home Care physicians, nurses, and staff deviated from the standard of care in preventing and treating pressure ulcers, and their deviations proximately caused Decedent to develop a sacral pressure ulcer and resulting injuries including osteomyelitis, sepsis, and death.

In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process as summarized by the Second Department: "[A] defendant must make a prima facie showing either that there was no departure from good and accepted medical practice, or that the plaintiff was not injured by any such departure" (*Rosenzweig v Hadpawat,* 229 AD3d 650, 652 [2d Dept 2024]). "In order to sustain this prima facie burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's complaint and bill of particulars" (*Martinez v Orange Regional Med. Ctr.,* 203 AD3d 910, 912 [2d Dept 2022]). "Once a defendant physician has made such a showing, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact, but only as to the elements on which the defendant met the prima facie burden. Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions." (*Rosenzweig,* at 652 [2d Dept 2024] [internal quotation marks and citations omitted].) However, "expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (*Barnaman v Bishop Hucles Episcopal Nursing Home,* 213 AD3d 896, 898-899 [2d Dept 2023]).

In support of SIUH's motion (Seq. No. 2) for summary judgment, the hospital submits an expert affirmation from William Mandell, M.D. ("Dr. Mandell"), a licensed physician certified in internal medicine and infectious diseases.

3

[* 3]

Dr. Mandell opines that SIUH properly treated Decedent during her various admissions in October 2017, November 2017, December 2017, March 2018, and June 2018, and no new pressure ulcers developed during those admissions, nor did existing pressure ulcers worsen.

Dr. Mandell notes that upon Decedent's June 22, 2018 admission to SIUH through August 1, 2018, "there were suspicions of a deep tissue injury at the sacrum" and her plan of care included decubitus ulcer "prophylaxis protocol, including turning and repositioning, skin pressure protection devices, and barrier cream." The expert opines that SIUH acted in accordance with the standard of care in recommending she should be discharged to a skilled nursing facility.

The expert notes that when Decedent returned to SIUH on September 11, 2018, she had an existing stage III pressure ulcer on admission. The expert opines that from this admission until the time of her death, SIUH modified her nutritional, wound care, and skin protection requirements appropriately.

From an infectious disease standpoint, the expert opines that Decedent's wound was timely cultured during her first October 2018 admission, proper antibiotics were administered, and she was deemed stable for discharge to Golden Gate Nursing Home. When she returned on October 25, 2018 with suspected sepsis, the expert opines that blood and urine cultures were timely taken and she was treated with the most effective antibiotics. The expert opines all medications were administered timely and in accordance with the standard of care.

The expert opines that the critical care team acted in accordance with the standard of care by only ordering debridement after she received clearance from a cardiac consult.

The expert further opines that it was not possible for Decedent to undergo any treatment for osteomyelitis or prevent her infection from spreading to the bone. The expert opines that an

4

[* 4]

infection of the bone "cannot be cured unless the sacral ulcer generates enough tissue to cover the exposed bone," and in Decedent's case, "she did not demonstrate the capacity to grow enough tissue to cover the bone" given her "multiple fever spikes, high risk for cardiogenic shock, aspiration pneumonia, and history of significant comorbidities." Additionally, she tested positive for C. Diff colitis, a specific bacterial infection that required "targeted treatment of Vancomycin" and was a contraindication for other antibiotics. For these reasons, the expert opines that it was not a deviation from the standard of care for SIUH providers to decide "not to specifically treat the decedent's sacral osteomyelitis with antibiotics," because doing so would have been "futile" and "ineffective."

On the issue of proximate causation, the expert opines that no pressure ulcers developed or worsened during the majority of her treatment at SIUH. During her July 2018 admission, the expert states her sacral deep tissue injury was preexisting and did not worsen, and its progression to a stage III pressure ulcer occurred between the time of her discharge home on August 1 and her admission to Sea View Hospital and Home on August 6, 2018.

During the October-December 2018 admission, the expert opines that despite all appropriate care and treatment, including skin protection measures and wound cleansing, Decedent's sacral pressure ulcer was resistant to healing and deteriorated to stage IV by December 16, 2018, "due to the fact that the decedent's overall health was already in rapid decline."

Finally, the expert opines that Decedent's death was an unavoidable result of her comorbidities and was not proximately caused by sepsis or infection stemming from the sacral ulcer.

5

[* 5]

SIUH also submits an expert affirmation from Cameron R. Hernandez, M.D. ("Dr. Hernandez"), a licensed physician board certified in internal medicine and geriatric medicine.

Dr. Hernandez opines in detail that all treatment and care rendered to Decedent on the dates at issue complied with the standard of care.

The expert notes that during Decedent's admission to SIUH from July 22, 2018 through August 1, 2018, when she underwent her second leg amputation, her sacral wound was documented for the first time as a "suspected deep tissue injury." The expert opines based on the record that barrier cream, protection devices, and decubitus pressure ulcer prevention protocols were properly ordered and implemented. The expert notes that Decedent was deemed stable for discharge to a skilled nursing facility on August 1, 2018, but her family and health care proxies insisted she return home and consulted with MJHS Home Care.

When Decedent returned to SIUH at various times from September 11, 2018 through October 9, 2018, the expert notes that she presented with an existing stage III sacral pressure ulcer. The expert opines that SIUH complied with the standard of care to "mitigate and slow development" of her pressure ulcer, in addition to treating her other conditions.

During her final admission to SIUH beginning October 25, 2018, the expert opines that Decedent received proper wound treatment and cleansing throughout her admission. The expert opines that any delay in debridement after her wound care consult on October 27, 2018 was to obtain consent from the family and "authority to proceed from the cardiology experts" due to her "overall poor condition" and risk factors for surgical intervention. The expert opines that Decedent underwent two surgical debridement procedures which were "timely and properly conducted."

6

[* 6]

On the issue of proximate causation, the expert opines that Decedent's claimed injuries, including the worsening of her pressure ulcer and death, were caused by numerous comorbidities and not any deviation from the standard of care in her treatment. The expert states that during Decedent's admissions at SIUH prior to October 2018, no pressure ulcers developed, and the pressure ulcers she presented with on admission "either healed or remained approximately the same size."

The expert opines that she was highly susceptible to pressure ulcers, "combatting various infections" during her admissions to SIUH, and her overall health was deteriorating from a combination of factors including peripheral vascular disease, heart attack, and end stage renal disease. The expert opines based on the record that her cause of death was cardiopulmonary arrest and renal failure, and the treatment and care related to her pressure ulcer was not a contributing factor in her death.

Based on the experts' submissions, SIUH has demonstrated prima facie entitlement to summary judgment on the issue of the hospital's liability. They have also met their prima facie burden in establishing the alleged departures did not proximately cause Decedent's injuries, including worsening pressure ulcer, infection, and death. As proximate causation is a necessary element in a wrongful death claim, SIUH has also established prima facie entitlement to dismissal of the wrongful death claim. The burden therefore shifts to Plaintiff to raise issues of fact as to these claims.

In opposition to the motion, Plaintiff submits an expert affirmation from a licensed physician [name of expert redacted], board certified in internal medicine and geriatric medicine. The unredacted, signed expert affirmation was submitted to the Court for *in camera* inspection.

7

[* 7]

Plaintiff's expert firstly notes inconsistencies in the SIUH record as to Decedent's risk of skin breakdown, implemented wound care and prevention protocols, and staging and sizing of the sacral pressure ulcer during her admissions. Plaintiff's expert opines that SIUH departed from the standard of care in documenting her pressure ulcers and instituting appropriate measures to prevent their development and deterioration.

Plaintiff's expert further opines that the two debridement procedures of Decedent's sacral pressure ulcer on November 15, 2018 and December 16, 2018 were not timely performed. The expert counters the movant's expert's statement that they were delayed due to her cardiac risk. Plaintiff's expert opines that she was equally at risk of "cardiac arrythmia, infarct, and sudden death" when the procedures were performed, and that it was a departure from the standard of care to not perform more timely and frequent debridement as her sacral pressure ulcer "continued to increase in size and became infected."

Plaintiff's expert also opines that Decedent's sacral and bone infection were not timely treated with appropriate antibiotics, countering the opinions of the movant's experts. Plaintiff's expert notes that an infectious disease physician did not swab and culture the sacral pressure ulcer until November 16, 2018. The expert further notes that a specific antibiotic, Daptomycin, was prescribed to Decedent "specifically to treat the sacral decubitus ulcer" on December 18, two days before her death, which contradicts the moving expert's opinion that such antibiotics were futile or contraindicated. Plaintiff's expert opines that the swabbing of the wound and prescription of Daptomycin were not timely.

Finally, on the issue of proximate causation, Plaintiff's expert opines that "a timely debridement is crucial to reduce infection and improve wound drainage and to prepare the wound bed for healing." Plaintiff's expert further opines that at the time the first debridement was

8

[* 8]

performed in November, there was exposed bone, fractured bone, and necrotic tissue, and thus the delay led her the worsening of her wound and infection.

Plaintiff's expert opines based on the medical records that Decedent's cause of death was "cardiopulmonary arrest, renal failure *and sepsis*," with her septic shock likely secondary to E.Coli or Klebsiella. Plaintiff's expert opines that this is consistent with the bacteria strain from her sacral pressure ulcer. The expert notes that throughout her records, her decline is attributed to "NSTEMI [heart attack], septic shock, decubitus ulcer infection." The expert also opines that if the sacral pressure ulcer was not the source of sepsis, that infection "contributed to her general decline and inability to recover from the septic shock," as she was combatting multiple infections and comorbidities at once.

Based on these submissions, Plaintiff's expert has raised issues of fact sufficient to defeat SIUH's motion for summary judgment, including whether it was a departure from the standard of care to not timely perform debridement, culture the wound, or prescribe appropriate antibiotics. Plaintiff also raises issues of fact as to whether these departures were a proximate cause of Decedent's injuries and death. "When experts offer conflicting opinions, a credibility question is presented requiring a jury's resolution" (*Stewart v. North Shore Univ. Hosp. at Syosset*, 204 AD3d 858, 860 [2d Dept. 2022] citing *Russell v. Garafalo,* 189 A.D.3d 1100, 1102 [2d Dept. 2020]). Accordingly, SIUH's motion for summary judgment is **denied.**

Turning to the motion of MJHS Home Care (Seq. No. 3), the movants submit an expert affirmation from Cameron R. Hernandez, M.D. ("Dr. Hernandez"), a licensed physician board certified in internal medicine and geriatric medicine.

Dr. Hernandez opines in detail that all home care evaluation and services provided by MJHS Home Care from February 16, 2018 through April 2, 2018 were in compliance with the

9

[* 9]

standard of care. The expert opines that she was administered proper medication, cardio-pulmonary assessments, blood glucose monitoring, and routine physical therapy visits. Her initial nursing assessment documented she had intact skin, no pressure injuries, and a surgical wound on her nose which was measured and scabbed weekly. The expert notes that her plan of care included "monitoring for the presence of skin lesions on the lower extremities."

The expert notes that on August 1, 2018, MJHS Home Care created an initial assessment through an interview with Decedent's health care proxy, and Decedent was not personally examined at that time. A plan to provide skilled nursing visits (with dialysis) and physical therapy/occupational therapy was discussed. On August 2, 2018, a nurse and physical therapist from MJHS Home Care visited Decedent at her home and concluded her spouse was unable to safely assist her with transfers and they did not have a Hoyer lift. The MJHS Home Care team recommended that Decedent return to a hospital or care facility rather than receive at-home services. The expert opines that these assessments did not "represent a formal start of care," and her initial evaluation was never completed due to the determination that a higher level of care was required.

Later, Decedent was transferred from Sea View to SIUH on September 11, 2018 with atrial fibrillation, hypotension, and a stage III/IV sacral pressure ulcer. On September 14-15, 2018, MJHS Home Care spoke with Decedent's son and created an initial assessment plan for at-home hemodialysis and nursing visits 2-3 times per week. They would also provide a wheelchair, Hoyer lift, hospital bed, and wound care assistance. The amended care plan on September 17, 2018 noted her unstageable sacral pressure ulcer and bilateral above the knee amputations. On September 17, 2018, a MJHS Home Care visiting nurse examined Decedent and provided daily skin care and turning/positioning instructions to her husband and son.

10

[* 10]

The movant's expert opines that the September 17, 2018 visit constituted a proper initial home care visit within the standard of care, including appropriate orders for further treatment, and her primary caregivers were properly instructed on wound care prevention and treatment techniques. Further, the expert notes that the visiting nurse confirmed in their records that she consulted with Decedent's primary physician regarding the sacral ulcer and "treatment plans for advanced skin breakdown."

On the issue of proximate causation, the movant's expert opines that none of the treatment or care provided by MJHS Home Care was a proximate cause of Decedent's claimed injuries or death. The expert emphasizes that no new or existing pressure ulcers developed during the treatment period from February-April 2018.

The expert also opines that MJHS Home Care's evaluation and assessment of Decedent's case on August 1-2, 2018 had no impact on the evolution of her deep tissue injury, which was preexisting when she was discharged from SIUH. The expert notes that the home care team determined she should be readmitted to a hospital or residential care facility, and she was admitted to Sea View Hospital and Home on August 6, 2018 with the "expected and normal sequalae of a deep tissue injury."

Finally, the expert opines that Decedent's sacral pressure ulcer did not worsen as a result any treatment or care provided by MJHS Home Care in September 2018. In fact, the expert notes that the sacral ulcer improved slightly during their short period of evaluation and treatment, as it was documented as stage II and measuring 2 cm x 1 cm when she was readmitted to SIUH on September 18, 2018.

Based on these submissions, the movant's expert has established prima facie entitlement to summary judgment on the issue of MJHS Home Care's liability. The expert opines in detail

11

that all home nursing and physical therapy visits provided by MJHS Home Care between February-April 2018 complied with the standard of care, including necessary risk assessments and wound prevention. The expert also establishes that the initial interview and assessment on August 1-2, 2018 was within the standard of care, resulting in a plan to transfer Decedent to a subacute rehabilitation facility rather than receive at-home services. Finally, the expert establishes that in September 2018, MJHS Home Care properly instituted a plan of care which included skin and wound care and instructions to her primary caregivers on pressure ulcer prevention and treatment.

Further, the movant's expert establishes that Decedent's claimed injuries were not proximately caused by any deviation from the standard of care on the part of MJHS Home Care. Regardless of the allegations that MJHS Home Care provided inadequate risk assessment or wound care from February-April 2018, there is no evidence that she had any existing, worsened, or newly developed pressure ulcers during that time.

The movants have also established prima facie that there is no causal link between Decedent's initial assessment or skilled nursing visit in August or September 2018 and the worsening of her sacral pressure ulcer. On both occasions, her treatment from MJHS Home Care was never formally started or it was interrupted by a hospitalization for unrelated medical treatment within days of the initial visit. The expert establishes prima facie that there was nothing further the MJHS Home Care home care staff could have done in those initial visits to change the progression or outcome of her sacral pressure ulcer. Accordingly, the movant has established their entitlement to summary judgment on the issue of liability and proximate causation, and the burden shifts to Plaintiff to raise an issue of fact.

12

[* 12]

In opposition, Plaintiff submits an expert affirmation from a licensed physician, [name of expert redacted], board certified in internal medicine and geriatric medicine.

Plaintiff's expert opines that MJHS Home Care staff failed to properly assess Decedent's risk for pressure ulcers, document her existing pressure injuries, and implement proper wound care during their evaluation and treatment periods.

Specifically, the expert opines that on her initial February 16, 2018 evaluation, MJHS Home Care improperly assessed Decedent's risk of developing pressure ulcers. The expert notes that she was evaluated as a 19 (low risk) on the Braden Scale by a home health aide, and a "detailed skin assessment was not performed." Although no pressure ulcers developed from this date until the final MJHS Home Care visit on April 2, 2018, the expert opines that MJHS Home Care "failed to properly address her risk factors" in accordance with the standard of care, including the fact that she was "bed-bound" and required assistance with all activities of daily living. The expert opines that the staff did not properly create a "care plan for wound/skin" and obtain "proper wound/skin orders" in light of her elevated risk factors.

Next, the expert states that on August 1, 2018, the MJHS Home Care records incorrectly stated Decedent had no history of stage III or IV pressure ulcers, and they did not indicate any wound care orders, despite the fact that she was released from SIUH with a sacral deep tissue injury measuring 6 cm x 4 cm. The expert acknowledges that no MJHS Home Care treatment was implemented following this informal assessment.

Finally, the expert opines that MJHS Home Care failed to document the presence of Decedent's sacral pressure ulcer in their September 14, 2018 records. Again, the expert admits that the "formal start of care" on which Decedent would begin receiving at-home visits was

13

[* 13]

September 17, 2018, but opines that the staff had a duty to "implement proactive interventions," wound care orders, or document the sizing/staging of the pressure ulcer.

Plaintiff's expert fails to raise an issue of fact as to any actual departures from the standard of care on the part of MJHS Home Care. The expert's opinions as to MJHS Home Care are conclusory, speculative, and unsupported by the record. The expert states that Decedent was incorrectly assessed as low-risk due to her limited mobility and opines vaguely that a personalized plan of skin/wound care should have been implemented from February through April 2018, but they do not articulate the applicable standard of care or counter the movant's expert opinions with any detail.

Regarding Decedent's initial assessments in August or September 2018, Plaintiff's expert also fails to raise a genuine issue of fact. The only opinion stated by the expert as to a departure from the standard of care is a failure to note the existence of the sacral pressure ulcer in the August 1 and September 14 records. However, both these initial assessments were based on informal interviews with her health care proxy *prior to* any physical examination of Decedent. Plaintiff's expert does not address the fact that Decedent's plan of care was amended by September 17, the date of her first and only nursing visit, to address the sacral pressure ulcer and wound care requirements.

Plaintiff's expert also wholly fails to raise an issue of fact as to proximate causation. It is undisputed that Decedent did not develop any new pressure ulcers during the February-April 2018 period, nor did she have any existing pressure ulcers which worsened or deteriorated. Plaintiff's expert also does not counter the movant's statement that Decedent's sacral pressure ulcer did not deteriorate, but in fact improved slightly, during the brief time between her

14

[* 14]

discharge and readmission to SIUH in September 2018, when she was seen and evaluated by MJHS Home Care.

As Plaintiff has failed to raise an issue of fact as to MJHS Home Care's departures from the standard of care, or that those departures proximately caused Decedent's claimed injuries or death, the motion for summary judgment on behalf of MJHS Home Care is **granted** and all claims against them are dismissed.

Accordingly, it is hereby:

**ORDERED** that Staten Island University Hospital's motion (Seq. No. 2) for an Order, pursuant to CPLR 3212, granting summary judgment in the movant's favor and dismissing this action against them in its entirety, is **denied;** and it is further

**ORDERED** that MJHS Home Care's motion (Seq. No. 3) for an Order, pursuant to CPLR 3212, granting summary judgment to the movant and dismissing all causes of action against them, is **granted.**

The Clerk shall enter judgment in favor of METROPOLITAN JEWISH HOME CARE, INC. d/b/a MJHS HOME CARE.

This constitutes the decision and order of this Court.

ENTER.

_____

**Hon. Consuelo Mallafre Melendez**

**J.S.C.**

15

[* 15]